O

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

Case No. SA CV 13-706 DOC (RNBx)                            Date: February 11, 2014

Title: INTERSTATE RESTORATION, LLC. V. THOMAS A. SEAMAN

PRESENT:

### THE HONORABLE DAVID O. CARTER, JUDGE

| Julie Barrera | Not Present |
|---|---|
| Courtroom Clerk | Court Reporter |

ATTORNEYS PRESENT FOR PLAINTIFFS:    ATTORNEYS PRESENT FOR DEFENDANTS:

NONE PRESENT                                        NONE PRESENT

PROCEEDING (IN CHAMBERS):     ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS SECOND AMENDED COMPLAINT [24]

     Before the Court is Defendant Thomas A. Seaman's Motion to Dismiss and Motion to Strike (Dkt. 24). The Court finds this matter appropriate for resolution without oral argument. Fed R. Civ P. 78; L.R. 7-15. Plaintiff Interstate Restoration, LLC ("Interstate") alleges claims against Defendant Thomas A. Seaman (the "Receiver") in his official capacity as the receiver for Medical Provider Financial Corporation III ("MPFC"). The Court dismissed Interstate's Complaint without prejudice on October 9, 2013. *See* Minute Order, October 9, 2013 (Dkt. 22). The Receiver now moves to dismiss Interstate's Second Amended Complaint for: (1) breach of contract; (2) promissory estoppel; (3) intentional misrepresentation; (4) false promise; (5) negligent misrepresentation; (6) restitution; and (7) constructive trust. First Amended Complaint ("FAC") (Dkt. 23) at 1. After reviewing the moving and opposing papers, the Court GRANTS IN PART and DENIES IN PART.

I.     Background

     The following facts are drawn from Plaintiff's FAC.

MPFC extended a loan and line of credit to Trace Life Sciences, Inc. ("Trace") on or about November 10, 2006. FAC ¶ 6. To secure the loan, Trace executed a Deed of Trust and Security Agreement ("Deed of Trust") in favor of MPFC for real and personal property that Trace owned in Texas (the "Texas Property"). FAC ¶ 7. After Trace defaulted, MPFC assumed control of the Texas Property. FAC ¶ 8.

In August, 2009, this Court entered a Preliminary Injunction and Order Appointing a Permanent Receiver ("PI Order") (Dkt. 44) as to MPFC and other entities. The Order appointed the Receiver as the permanent receiver of Medical Capital Holdings, Inc., Medical Capital Corporation, Medical Provider Funding Corporation IV, and their subsidiaries and affiliates, including MPFC. FAC ¶ 9. Pursuant to the PI Order, the Receiver assumed control of the Texas Property and hired Paul Crowe ("Crowe"), of NuView Life Sciences, Inc. ("NuView"), to manage Trace's operations during the receivership. FAC ¶ 10-11.

In early February 2011, the Texas Property suffered serious damage. FAC ¶ 11. The Receiver contacted Interstate to perform emergency repairs on the property, the "Emergency Work." FAC ¶¶ 11-12. When negotiating the terms of the work, Interstate communicated directly with the Receiver and his staff, Crowe, and insurance carriers. FAC ¶ 13. Around February 18, 2011, Interstate began Phase I Demolition work on the Texas Property pursuant to an oral agreement. FAC ¶ 16. Interstate asked the Receiver and Crowe about the status of the written agreement around February 22, 2011. FAC ¶ 17. On February 23, 2011, Interstate received an Advance Work Order that was executed by the Receiver and Crowe for emergency demolition and repairs (the "Emergency Work") on the Texas Property. FAC ¶ 18. In a February 25, 2011 email, the Receiver's office wrote to Interstate that, "the insurance [company] would pay the receiver as lender as the loss payee [sic] and then we [the receiver] will pay Interstate." FAC ¶ 14. The final Work Order for the Phase I work was executed between Interstate and Trace, while the Receiver only "acknowledged the agreement as lender and loss payee for the insurance company." FAC ¶ 19. When Interstate completed the Phase I work, the Receiver fully compensated Interstate in accordance with the February 25, 2011 email. FAC ¶ 21.

In mid-to-late February 2011, the Receiver, Interstate, and Crowe negotiated a change order for Phase II Demolition work. FAC ¶ 22. The Receiver gave Interstate a signed change order for the Phase II work on March 2, 2011. FAC ¶ 23. A "final, executed order" for the Phase II work was not completed, however, until after the Phase II work was completed. FAC ¶ 23. Interstate was fully compensated for the Phase II work as discussed in the February 25, 2011 email. FAC ¶ 24.

While the Emergency work was underway, Interstate negotiated with the Receiver about the work needed to restore the Texas Property (the "Restoration Work"). FAC ¶ 25. The Receiver was responsible for approving the proposed scope and terms of the Restoration Work, and for dealing with insurance carriers and adjusters for the Texas Property's policies. FAC ¶ 25. Around February 22,

2011, Interstate provided the Receiver, at the Receiver's request, a draft agreement governing the Restoration Work.  FAC ¶ 26.

In late March 2011, Interstate issued an AIA Document A107 Standard Form of Agreement Between Owner and Contractor ("Restoration Contract") to Trace and the Receiver for the Restoration Work.  FAC ¶ 28.  On or about April 6, 2011, a NuView representative told Interstate that the Receiver "would not execute the contract and would only handle the funds for the project."  FAC ¶ 29.  The Receiver's employee clarified by email that: "It's not that the Receiver will not sign the contract, we just don't sign it as the owner.  The contract is between the owner (Trace) and Interstate, thus the receiver is not a party to the contract.  The receiver will sign the contract just as we did for the demolition contract, meaning we [will] 'acknowledge' the contract on behalf of the lender."  FAC ¶ 31.

In late April 2011, Interstate asked the Receiver about the status of the Restoration Contract and of the insurance funds for the Restoration Work.  FAC ¶ 32.  The Receiver stated that he was in possession of approximately $900,000 in insurance funds that would be used to pay for the Restoration Work.  The Receiver also told Interstate that it was planning to sell the Trace assets, including its interest in the Texas Property, to NuView, and that it would transfer the insurance funds to NuView in conjunction with that sale.  FAC ¶ 32.  The Receiver told Interstate that NuView would make the actual payment, and that NuView, not the Receiver, would acknowledge the formal written agreement as loss payee, since NuView would ultimately provide the transferred insurance proceeds to Interstate for the Restoration Work.  FAC ¶ 32.

Based on the Receiver's representations that the Receiver had insurance proceeds in its possession, that the Receiver would transfer those proceeds to NuView, and that NuView would use those proceeds to pay Interstate for the Restoration Work, Interstate commenced the Restoration Work on the Texas Property.  FAC ¶ 33.  Interstate "repeatedly informed" the Receiver that it would move, and was moving, forward with the Restoration Work before the sale to NuView "based upon the Receiver's representations and Interstate's understanding that, as with the Emergency Work, the parties had reached an agreement as to the scope and terms of work that was merely awaiting a final executed contract."  FAC  ¶ 33.

Around May 4, 2011, Interstate sent the Receiver a billing statement for a down payment on the Restoration Work.  FAC ¶ 34.  The Receiver responded by email stating that it had funds from the insurance carrier, and was waiting for the final signed contract between Interstate and Crowe to pay Interstate.  FAC ¶ 34.  Crowe also responded by email, writing that, "As we are nearing the close of the Trace acquisition, I'm requesting a time-out until the transfer of ownership is completed and hope you understand that we cannot issue any new contracts at this time.  A check is being drawn and issued by the Receiver's office as we speak – previously approved and you should have that very soon."  FAC ¶ 35.  Interstate "clarified" that Crowe meant that Interstate should continue moving forward with the

preliminary aspects of the Restoration Work while the formalities of the Trace sale were completed, and that the final executed contract would be completed after the Trace sale. FAC ¶ 37.

Through late May 2011, Interstate asked the Receiver multiple times about the status of the insurance proceeds for the Restoration Work. FAC ¶ 37. On May 27, 2011, the Receiver wrote to Interstate that the Receiver had transferred its interests in Trace to NuView and had no remaining interests in Trace or the Texas Property. FAC ¶ 37. The Receiver also wrote that "all insurance funds have been transferred to NuView," and that Interstate should contact Crowe regarding the insurance claim. FAC ¶ 37. Relying on the Receiver's representations, Interstate entered into a written agreement with Trace and NuView on May 27, 2011, to complete the Restoration Work. FAC ¶ 38. NuView acknowledged the contract, not the Receiver. FAC ¶ 38. After the contract was finalized, Interstate completed the bulk of the Restoration Work. FAC ¶ 38. "If the Receiver had not represented to Interstate that it was in possession of $900,000 in insurance proceeds to pay Interstate for the Restoration Work, that it would transfer those funds to NuView as part of the sale of the Trace assets, and that it had, in fact, transferred the funds as promised, Interstate would not have entered into a contract with NuView as loss payee." FAC ¶ 38.

Interstate completed the Restoration Work on September 27, 2011, at a total cost of $2,715,331.84. FAC ¶ 41. In November 2011, counsel for Crowe sent Interstate a copy of a Final Settlement Statement ("Statement") dated May 3, 2011, showing the sale of the Texas Property interests from the Receiver to NuView. FAC ¶ 39. The Statement showed that the insurance proceeds were used as a credit to the purchaser in the sale to NuView. FAC ¶ 39. This was the first time Interstate learned that the Receiver had not transferred the insurance proceeds to NuView and had instead allowed NuView to use the proceeds as a credit against the purchase price from the receivership. FAC ¶ 39.

As of the date Interstate filed its Complaint, it had not been compensated for at least $900,000 of the Restoration Work. FAC ¶ 41.

II. Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a complaint must be dismissed when a plaintiff's allegations fail to state a claim upon which relief can be granted. In order for a complaint to survive a 12(b)(6) motion, it must state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). A claim for relief is facially plausible when the plaintiff pleads enough facts, taken as true, to allow a court to draw a reasonable inference that the defendant is liable for the alleged conduct. *Id.* at 678. If the facts only allow a court to draw a reasonable inference that the defendant is possibly liable, then the complaint must be dismissed. *Id.* at 679. On a motion to dismiss, this court accepts as true a plaintiff's well-pled factual allegations and construes all factual inferences

in the light most favorable to the plaintiff. *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). The court is not required to accept as true legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 678.

Additionally, Federal Rule of Evidence 201 allows the court to take judicial notice of certain items without converting the motion to dismiss into one for summary judgment. *Barron v. Reich*, 13 F.3d 1370, 1377 (9th Cir. 1994). The court may take judicial notice of facts "not subject to reasonable dispute" because they are either: "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201; *see also Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) (noting that the court may take judicial notice of undisputed "matters of public record"), *overruled on other grounds by* 307 F.3d 1119, 1125-26 (9th Cir. 2002). The court may disregard allegations in a complaint that are contradicted by matters properly subject to judicial notice. *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010).

Dismissal without leave to amend is appropriate only when the court is satisfied that the deficiencies in the complaint could not possibly be cured by amendment. *Jackson v. Carey*, 353 F.3d 750, 758 (9th Cir. 2003); *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000). Rule 15(a)(2) of the Federal Rules of Civil Procedure states that leave to amend should be freely given "when justice so requires." This policy is applied with "extreme liberality." *Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990).

III. Discussion

    a. Breach of Oral Contract

Interstate claims that the Receiver breached an oral contract by failing to transfer the $900,000 in insurance proceeds to NuView, or otherwise transfer them to Interstate. FAC ¶ 47. The Court previously dismissed Interstate's breach of contract claim for a failure to allege facts showing mutual assent or consideration. *See* Order at 7-8.

In the FAC, Interstate alleges a breach of the following oral contract:

> In late April 2011, the Receiver and Interstate entered into an oral contract for Restoration Work on the Texas Property. Pursuant to that agreement, the Receiver agreed to pay approximately $900,000 in insurance proceeds to Interstate in exchange for the Restoration Work by transferring those proceeds to Nu View to pay Interstate. In return, Interstate commenced the Restoration Work before the sale of Trace assets closed, thereby conferring a benefit upon the Receiver by making necessary repairs to a property

5

under the receivership's control, increasing the value of the Trace assets that the receivership was trying to sell, and, on information and belief, enabling the Receiver to close the sale of the Trace assets in May of 2011.

FAC ¶ 43.

"A cause of action for damages for breach of contract is comprised of the following elements: (1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff." *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1388 (1990). Mutual assent "is determined by objective rather than subjective criteria, the test being what the outward manifestations of consent would lead a reasonable person to believe." *Money Store Inv. Corp. v. S. California Bank*, 98 Cal. App. 4th 722, 728 (2002). "The parties' outward manifestations must show that the parties all agreed upon the same thing in the same sense. If there is no evidence establishing a manifestation of assent to the 'same thing' by both parties, then there is no mutual consent to contract." *Weddington Prods., Inc. v. Flick*, 60 Cal. App. 4th 793, 811 (1998) (internal citation and quotation marks omitted). "The parties must mutually assent to a sufficiently definite offer so that upon acceptance, the parties' obligations are reasonably certain." *Id.*

i. Mutual Assent

The FAC alleges no facts that support any explicit agreement. Although Interstate claims that it alleged this by claiming that the Receiver agreed to transfer the funds "in exchange for" the commencement of the Restoration Work, this is merely a bald allegation in the cause of action section of the FAC, and no actual facts support that inference. *See* Opp'n at 7; FAC ¶ 43. Interstate therefore cannot state a cause of action for breach based on an explicit agreement.

Interstate primarily relies on its argument that the parties' course of conduct shows mutual assent. Interstate claims that the parties' conduct in negotiating the Emergency Work show a course of conduct demonstrating mutual assent because it shows a course of conduct in which: (1) Interstate would commence work based on negotiations with the Receiver and Crowe (FAC ¶¶ 16, 22); (2) Interstate and the Receiver did not formally execute their own written contract; (3) Interstate and Trace would execute a final work order after the work had commenced (FAC ¶¶ 18, 23); (4) Interstate would complete the work (FAC ¶¶ 20, 23); and (5) upon completion of the work and execution of the final work order between Interstate and Trace, the Receiver would disburse insurance funds in its possession to pay Interstate (FAC ¶¶ 21, 24).

There is a significant problem with Interstate's narrative, however. In the first part of Interstate's negotiations with the Receiver and NuView, the Receiver said explicitly that it would pay Interstate with insurance funds, and the Receiver in fact did so. FAC ¶¶ 14, 21, 24. When Interstate

6

sent the Receiver and Crowe a Standard form of Agreement for the Restoration Work, the Receiver's office stated that it would again "acknowledge" the contract as loss payee as it had in the past. FAC ¶ 30. Negotiations between the parties continued. FAC ¶ 31. In "late April," however, when Interstate asked the Receiver about the status of the Restoration Work, the Receiver told Interstate the following: 1) that the Receiver had $900,000 from the insurance company to pay Interstate for the Restoration Work; 2) that the Receiver was selling the Trace assets, including the Texas Property, to NuView; 3) that the Receiver would transfer the insurance funds to NuView to pay Interstate; 4) that NuView would actually pay Interstate and acknowledge the written contract as loss payee. FAC ¶ 32. The FAC states that Interstate began the Restoration Work in reliance on these representations.

This is a fundamental shift from the earlier dealings between the parties, during which the Receiver made clear that the Receiver would pay Interstate, and would acknowledge the contracts as loss payee. But before any actual agreement regarding the Restoration Work occurred, the Receiver explicitly told Interstate that it would not do things as it had before, and that instead NuView would receive the insurance funds, transmit them to Interstate, and sign the contract as loss payee. Thus, although Interstate's newly alleged facts suggest that a fully executed final agreement was not always complete before work began, the facts also show a clear repudiation by the Receiver of the prior course of conduct regarding payment. And because the Receiver expressly stated that *it would not pay Interstate*, no contract can possibly have been formed by which the Receiver agreed to "pay" Interstate $900,000. This is made even more clear by the fact that, in response to Interstate's billing statement for a down payment, the Receiver noted that it was waiting for a signed agreement between NuView and Interstate.

Interstate also alleges a promise to transfer funds to NuView, in exchange for the Restoration Work. The facts are clear, however, that the Receiver stated it would not contract with Interstate for the Restoration Work. Interstate also claims that it agreed to begin the Restoration Work in exchange for the transfer of the funds. Interstate alleges that it repeatedly told the Receiver it was beginning the work after the "late April" discussion of the Restoration Work based on its understanding that a final agreement had been reached. FAC ¶ 33. There is no indication in the FAC of whether the Receiver affirmatively agreed to these statements. But, on May 4, 2011, when Interstate asked for a down payment for the Restoration Work, the Receiver responded that it was waiting for a signed agreement between Interstate and NuView. FAC ¶ 34. Crowe then sent an email on behalf of NuView stating that it could not issue a new contract yet. FAC ¶ 35. The FAC states that "Interstate clarified that Crowe meant that Interstate should continue moving forward with the preliminary aspects of the Restoration Work." FAC ¶ 36. The FAC is silent on what the term "clarified" means, or whether there was any response. Notably, it is clear on these facts that NuView, not the Receiver, was the party controlling the disbursement of the insurance funds and the contract for the Restoration Work. This

therefore does not raise any plausible inference of mutual assent to exchange anything for the commencement of the Restoration Work.

The Court therefore finds that the FAC, although it adds facts explaining a course of conduct that did not require final executed documents, does not show that the Receiver ever agreed to transfer the funds in exchange for the Restoration Work itself or for Interstate beginning the Restoration Work. Interstate has simply failed to allege facts that show any actual agreement by the Receiver to transfer the insurance funds in exchange for any action by Interstate. The fact that Interstate took independent action that the Receiver did not stop might generate a quantum meruit or other unjust enrichment claim with respect to the value of the Trace assets, but it does not generate a contract.

   ii. Consideration

Interstate alleges that it conferred a benefit on the Receivership estate by commencing the Restoration Work, which increased the value of the Trace assets before sale. It is difficult for the Court to understand how Interstate's prep work and early Restoration Work could serve as consideration for the Receiver transferring funds to NuView. This is not a question of adequacy of consideration, but simply of whether the alleged facts actually create an inference that there was an agreement to exchange anything. It is true that the FAC alleges a course of conduct suggesting that work would start upon agreement with payment later, but during those negotiations the Receiver was acting as loss payee. During the alleged promise to transfer the funds to a third party in exchange for commencing the Restoration Work, the Receiver had specifically stated that the Receiver would not be a part to the contract and would not acknowledge it.

This would constitute pleading adequate consideration if there were sufficient facts to show that this consideration was offered and accepted in exchange for something in return. But, as discussed above, there is no such arrangement. Conferring a benefit without a contract might yield an unjust enrichment claim, but cannot support an action in contract.

   iii. Causation

Furthermore, the Court agrees with the Receiver that the FAC does not plead facts showing that the Receiver's actions caused Interstate's harm. Interstate claims that the Receiver's failure to transfer the funds to NuView caused Interstate's harm because: 1) had Interstate known the Receiver had not transferred the funds, it would not have contracted with NuView; 2) NuView could not have paid Interstate without the insurance funds; and 3) NuView could have paid Interstate the $900,000 if the Receiver had transferred it.

First, the Receiver's knowledge of whether NuView could or could not pay is not relevant to whether his actions *caused* harm. Therefore, the third basis for causation makes no sense. Second, the argument that the Receiver caused harm because Interstate would not otherwise have contracted with NuView is inapposite in this context. That fact does not depend on whether the Receiver breached the alleged contract, but rather on "false representations." The Court will address this further with respect to Interstate's misrepresentation claim.

The only plausible theory, then, is that the Receiver caused harm by not transferring the funds to NuView in the way that Interstate claims was promised because NuView otherwise would have paid Interstate (or at least been more likely to pay Interstate). But this theory ignores NuView's own agency. The Receiver did not steal the funds from NuView, or force NuView to spend the funds elsewhere. The Receiver put the funds at NuView's disposal, and NuView chose to pay the Receiver, not Interstate. It is baffling to the Court what the Receiver should have done differently – refuse the credit on the purchase? Ask NuView to take the money out of the receivership estate and then write the Receiver a check? It is clear on the alleged facts that the Receiver did not promise to pay Interstate for the Restoration Work. Although Interstate tries to characterize a promise in this manner, the facts simply cannot support that inference, even when viewed in the light most favorable to Interstate. The facts also show that the Receiver's actions did not cause Interstate harm by making it less likely NuView would pay them – this is not a hypothetical situation in which we do not know how NuView might otherwise have acted. NuView paid the Receiver for the Trace assets; there is no plausible inference that, had the Receiver somehow finagled a slightly different financial transaction, NuView would have done anything differently.

Thus, even though any reliance on the Receiver's statements need not be the sole cause of Interstate's actions, the Court finds that Interstate has not alleged facts that plausibly establish causation. The Receiver had no control over whether NuView would pay the Interstate, and no way to control NuView's financial decisions. Interstate's real dispute is with NuView. Interstate has not alleged facts in its Complaint that enable it to hold the Receiver liable for that damage on a contract theory.

The Court thus DISMISSES Plaintiff's claim for breach of contract.

b. Promissory Estoppel

Interstate alleges that the Receiver made promises to Interstate that support a claim for promissory estoppel. Interstate claims that the Receiver "promised Interstate that it had approximately $900,000 in insurance proceeds in its possession for restoration of the Texas Property, and the Receiver would transfer those monies to NuView . . . to compensate Interstate for the Restoration Work." FAC ¶ 51. Interstate characterizes these allegations as the Receiver's "promises to reserve the insurance

9

proceeds for the Restoration Work and to facilitate their transfer to Interstate . . ." FAC ¶ 55. Interstate alleges that it reasonably relied on these promises by commencing the Restoration Work, contracting with NuView to complete the Restoration Work, and ultimately finishing the Restoration Work. FAC ¶ 55. Interstate again includes in its promissory estoppel claim the Receiver's May 27, 2011 statement that it transferred all insurance funds. This is a statement, however, not a promise for future action, and so is only relevant to Interstate's misrepresentation claims.

The elements of a promissory estoppel claim are "(1) a promise clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3) [the] reliance must be both reasonable and foreseeable; and (4) the party asserting the estoppel must be injured by his reliance." *Aceves v. U.S. Bank, N.A.*, 192 Cal. App. 4th 218, 225 (2011), as modified (Feb. 9, 2011). Promissory estoppel provides a substitute for actual consideration when a promisor should reasonably anticipate that another party will rely on a promise, even if there is no formal exchange. *See Id*. at 230-31 ("Under this doctrine a promisor is bound when he should reasonably expect a substantial change of position, either by act or forbearance, in reliance on his promise, if injustice can be avoided only by its enforcement . . .").

In its last order, the Court dismissed this claim for a lack of facts raising a plausible inference of reasonable reliance, foreseeability, and causation. The additions in the FAC cure the weaknesses in reliance and foreseeability, at least for the purposes of a motion to dismiss. Interstate pleads additional details regarding the course of dealing between the parties, repeated reassurances by the Receiver and NuView, its repeated questions to the Receiver about the insurance funds, and its informing the Receiver that it was commencing work on the project. However, the Court finds that the same causation issues that preclude Interstate's breach of contract claim also apply to its promissory estoppel claim. The FAC is therefore insufficient on this basis.

The Court thus DISMISSES Interstate's promissory estoppel claim.

    c.  False Promise

Interstate also alleges false promise and intentional misrepresentation claims with respect to both the April 2011 statements and the May 27, 2011 statement. Because the factual circumstances and legal implications of each statement differ, the Court addresses them separately. The Court first considers a false promise claim based on Interstate's arguments with respect to the April 2011 statements. The May 27, 2011 statement does not appear from the facts of the FAC to be a promise, and so is addressed as an intentional misrepresentation claim below.

False promise is a species of intentional misrepresentation wherein the defendant makes a promise without any intention to perform, the defendant makes the promise with the intent to induce

10

reliance by the plaintiff, the plaintiff reasonably relies on the false promise, and that reliance causes the plaintiff harm.  *See Engalla*, 15 Cal. 4th at 973-74; *Hills Transp. Co. v. Sw. Forest Indus., Inc.*, 266 Cal. App. 2d 702, 708 (1968).

Interstate alleges that the April 2011 statements that the Receiver would transfer the $900,000 in insurance proceeds to NuView constitute a false promise on which Interstate justifiably relied.  The Court finds that the same problems affecting Interstate's causation allegations with respect to its contract and promissory estoppel claims also defeat its false promise claim.  The FAC does not allege facts supporting a plausible inference that its reliance on the allegedly false promise caused the harm Interstate suffered.

Thus, the Court DISMISSES Plaintiff's false promise claim.

    d.  Intentional Misrepresentation

Interstate alleges that the Receiver made multiple intentional misrepresentations: 1) in late April 2011, the Receiver intentionally misrepresented that "the receivership had approximately $900,000 in insurance proceeds in its possession for restoration of the Texas property, and the Receiver would transfer those proceeds to NuView in connection with the impending sale of the Trace assets . . ."; 2) on May 4, 2011, the Receiver reiterated that it had the insurance proceeds and that the proceeds "would be paid to Interstate upon final execution of a written contract" with NuView; 3) that Crowe confirmed this the same day with the Receiver's knowledge; and 4) on May 27, 2011, the Receiver wrote in an email that "all insurance funds have been transferred to NuView."  FAC ¶¶ 62-65.  Interstate alleges that these representations were false in light of the timeline of the Receiver's agreement with NuView, that "the Receiver intended that Interstate would rely on the representations regarding payment to commence and complete the Restoration Work," that Interstate relied on the representations by commencing the Restoration Work, contracting with NuView, and eventually completing the work.  FAC ¶¶ 69-73.

First, only present statements of fact can serve as the basis for an intentional misrepresentation claim, as distinct from a false promise claim.  *See* 5 Witkin, Summary of California Law (10th Ed. 2005) Torts, § 781, p. 1131.  The Court addressed Interstate's claims of false promise in a separate section.  Here, the Court only addresses allegedly false statements of then-existing fact, rather than future events.  These statements appear to only be the Receiver's statements that he had the $900,000, and the May 27, 2011 statement that "all insurance proceeds have been transferred to NuView."

To prove an intentional misrepresentation claim, a plaintiff must show that "(1) the defendant made a misrepresentation, including a false representation, concealment, or nondisclosure; (2) the defendant had knowledge that the statement was false; (3) the defendant acted with intent to defraud or

11

induce reliance; (4) the plaintiff justifiably relied on the defendant's statement; and (5) the plaintiff was damaged by that reliance." *Firoozye v. Earthlink Network*, 153 F. Supp. 2d 1115, 1128 (N.D. Cal. 2001). Under Federal Rule of Civil Procedure 9, a plaintiff must plead fraud with particularity. *Vess v. Ciba–Geigy Corp. USA,* 317 F.3d 1097, 1103 (9th Cir.2003). "Averments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged." *Id.* at 1106 (quoting *Cooper v. Pickett,* 137 F.3d 616, 627 (9th Cir. 1997)). "While statements of the time, place and nature of the alleged fraudulent activities are sufficient, mere conclusory allegations of fraud" are not. *Moore v. Kayport Package Express, Inc.,* 885 F.2d 531, 540 (9th Cir.1989).

Previously, the Court dismissed this claim for a failure to allege facts showing a plausible inference of reasonable reliance and causation. The Court finds that the FAC pleads sufficient facts to raise an inference of reasonable reliance, including additional facts regarding the timeline of the agreement and the parties' prior relationship. The causation question in the misrepresentation context is also different from the causation question in the contract and promissory estoppel context. For the contract and promissory estoppel claims, the harm had to be caused by the Receiver's failure to make good on the alleged promise – to actually transfer the funds. There is simply no reasonable inference that the Receiver's failure to do so caused the harm. However, in the misrepresentation context, Interstate alleges that the Receiver's allegedly false statements induced Interstate to contract with NuView because the Receiver's statements suggested financial resources that NuView did not actually have. It is plausible, viewing all facts in the light most favorable to Interstate, that this could constitute a "substantial factor" in at least some of the harm Interstate alleges.

Thus the Court DENIES the motion to dismiss Plaintiff's intentional misrepresentation claim.

   e. Negligent Misrepresentation

"The elements of a cause of action for negligent misrepresentation are the same as those of a claim for fraud, with the exception that . . . it is sufficient to allege that the defendant lacked reasonable grounds to believe the representation was true." *Neilson v. Union Bank of California, N.A.*, 290 F. Supp. 2d 1101, 1141 (C.D. Cal. 2003). The Receiver is correct that Interstate cannot base a negligent misrepresentation claim on a false promise. *See Tarmann v. State Farm Mut. Auto. Ins. Co.*, 2 Cal. App. 4th 153, 158 (1991). Interstate thus can only allege misrepresentation with respect to statements of then-existing fact, such as the April statements that the Receiver had $900,000 and the May 27, 2011 statement that "all insurance funds" had been transferred.

Previously, the Court held that there were insufficient facts to show that the Receiver had a duty that would satisfy the elements of a negligent misrepresentation claim. The Receiver argues again that because it had no pecuniary interest in the commercial transaction at that point, it had no duty of care and so cannot be liable in negligence. Under California law, a party engaged in a commercial or

12

business interaction generally owes a duty of care to other parties engaged in the same commercial endeavor or course of business dealings. *Friedman v. Merck & Co.*, 107 Cal. App. 4th 454, 482 (2003). However, that duty only exists where a party has "a pecuniary interest in the transaction in which the information is given." *Id*. (quoting Rest. 2d Torts § 522). "If he has no pecuniary interest and the information is given purely gratuitously, he is under no duty to exercise reasonable care and competence in giving it." *Id*. The rule is designed to prevent casual statements or curbstone opinions from providing a basis for liability. *Id*.; *Lawyers Title Ins. Corp. v. Baik*, 55 P.3d 619, 626 (Wash. 2002).

In light of the allegations in the FAC, the Court finds sufficient facts to raise an inference that a duty existed in this case. The Court therefore finds that Interstate has alleged sufficient facts to go forward on its negligent misrepresentation claim. The Court thus DENIES the motion with respect to negligent misrepresentation.

f. Restitution and Constructive Trust

There is no clear statement of California law addressing whether restitution and constructive trust constitute independent causes of action, or simply remedies or effects. *See In re DirecTV Early Cancellation Litig.*, 738 F. Supp. 2d 1062, 1091 (C.D. Cal. 2010) ("There is some disagreement among California courts about whether unjust enrichment is an independent claim."). Some California courts have held that unjust enrichment is not a cause of action, "but rather . . . a general principle, underlying various legal doctrines and remedies. . . . It is synonymous with restitution." *McBride v. Boughton*, 123 Cal. App. 4th 379, 387 (2004) (internal quotation marks and citations omitted); *see also Lauriedale Associates, Ltd. v. Wilson*, 7 Cal.App.4th 1439, 1448 (1992) ("The phrase 'Unjust Enrichment' does not describe a theory of recovery, but an effect . . ."). Federal courts in this district have largely found that restitution cannot form the basis of an independent cause of action. *See LaCourt v. Specific Media, Inc.*, 2011 WL 1661532, at *8 (C.D. Cal. Apr. 28, 2011); *Robinson v. HSBC Bank USA*, 732 F. Supp. 2d 976, 987 (N.D. Cal. 2010).

The case law Plaintiff cites does not show that unjust enrichment can be an independent cause of action. *Durell v. Sharp Healthcare* states that there is no such cause of action, and goes on to explain that restitution may be awarded based on a separate claim. 183 Cal. App. 4th 1350, 1370 (2010). Similarly, *Cramer v. Biddison* places a constructive trust in the same category as restitution: "an equitable remedy." 257 Cal. App. 2d 720, 725 (1968). A constructive trust may be awarded when "one has an equitable right to property legal title to which stands in another," *id*., as a cure for a separate breach or unfairness. Previously, the Court held that Interstate had not sufficiently alleged an independent cause of action to support restitution or a constructive trust.

13

In its Opposition, Interstate argues that these arguments are supported by the intentional misrepresentation claim. Opp'n at 23. Interstate argues that the Receiver was "unjustly enriched" with the $900,000 to which claims ownership by dint of the Receiver's misrepresentations. But there are no facts that suggest that the Receiver was enriched by Interstate's work, or that Interstate itself otherwise conferred a benefit on the Receiver that went uncompensated. Interstate argues repeatedly that it should have received the insurance funds instead of the Receiver, but as discussed previously, it has not alleged any plausible claim that the Receiver was responsible for paying Interstate directly, or that the Receiver took the funds from Interstate by fraud. The fact that the Receiver ultimately received these funds was not a result of Interstate's uncompensated work. Rather, it was a result of NuView's decision to pay the Receiver instead of Interstate. To the extent that the intentional misrepresentation claim alleges that the Receiver harmed Interstate, it is not alleged that this misrepresentation caused NuView to pay the Receiver instead of Interstate. Rather, an unjust enrichment claim for Interstate's unpaid work should be levelled at NuView, who received the benefit of the Restoration Work but did not compensate Interstate.

The only exception is Interstate's allegation that it began the Restoration Work, told the Receiver that it was beginning that work, and that its work increased the purchase price of the Trace assets. The facts in the FAC raise a plausible inference that this limited work, up until the Trace assets were sold, conferred some benefit on the Receiver and so could theoretically support an unjust enrichment claim.

Beyond this narrow ground, the constructive trust and unjust enrichment claim are DISMISSED.

### g. Punitive Damages

The Receiver also moves the Court to strike Plaintiff's request for punitive damages. A plaintiff may request punitive damages for "oppression, fraud, or malice." Cal. Civ. Code § 3294(a). Fraud includes intentional misrepresentation. *Id.* at § 3294(c)(3). Because the intentional misrepresentation claims will go forward, the Motion to Strike is DENIED.

### h. Request for Judicial Notice

The Receiver also submits a Request for Judicial Notice attached to the Motion to Dismiss (Dkt. 24-1), and a Supplemental Request for Judicial Notice (Dkt. 26-1). As the Court previously ruled, the Receiver's request to consider the referenced documents is GRANTED, but only as to their existence and legal effect. *See Neilson*, 290 F. Supp. 2d at 1113.

## IV. Disposition

In light of the foregoing, the Court orders the following:

   The Motion to Dismiss is GRANTED with respect to Plaintiff's claims for breach of contract, promissory estoppel, and false promise, with leave to amend.  The Motion is DENIED with respect to the intentional and negligent misrepresentation causes of action.  The Motion is GRANTED in part and DENIED in part with respect to the unjust enrichment claim.  The Court GRANTS the Request for Judicial Notice, and DENIES the Motion to Strike.

   A Second Amended Complaint is to be filed, if at all, on or before February 21, 2014.

Clerk's Initials: jcb