1   Mitchell A. Kamin - State Bar No. 202788
       mak@birdmarella.com
2   David H. Chao - State Bar No. 273953
       dhc@birdmarella.com
3   BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
    DROOKS, LINCENBERG & RHOW, P.C
4   1875 Century Park East, 23rd Floor
    Los Angeles, California 90067-2561
5   Telephone: (310) 201-2100
    Facsimile: (310) 201-2110
6
7   Attorneys for Plaintiff Interstate
    Restoration, LLC

8
9

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

10
11

| INTERSTATE RESTORATION, LLC, | Case No. 8:13-cv-00706 DOC (RNBx) |
|---|---|
| Plaintiff, | **PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT** |
| vs. | |
| THOMAS A. SEAMAN, as Receiver for Medical Provider Financial Corporation III, and DOES 1-10, | |
| Defendants. | *[Filed concurrently with Plaintiff's Statement of Genuine Disputes of Material Fact; Declaration of David H. Chao; Declaration of Dan Dansby, in Support Thereof.]* |
| | Date:    June 23, 2014 |
| | Time:    8:30 a.m. |
| | Ctrm.:   9D |
| | Judge:  Hon. David O. Carter |
| | Complaint Filed: May 2, 2013 |

3088649.6

# **TABLE OF CONTENTS**

**Page**

I.       INTRODUCTION ...................................................................................... 1

II.      FACTUAL BACKGROUND ..................................................................... 1

   A.    Receiver's Efforts to Sell the Loan to NuView ..................................... 1

   B.    Flood at the Trace Facility ................................................................. 2

   C.    Interstate Performs Demolition Work.................................................. 2

   D.    Receiver Deposits Insurance Funds for Interstate's Work .................... 3

   E.    Receiver Amends Loan Sale Contract to Obtain Discretion to
         Credit Insurance Funds ..................................................................... 3

   F.    Receiver And Interstate Negotiate Restoration Work ........................... 4

   G.    Receiver Decides to Credit Any Remaining Insurance Funds ............... 4

   H.    Receiver's May 4-5, 2011 Statements ................................................. 5

   I.    Receiver Credits the Insurance Funds In The Loan Sale........................ 6

   J.    Receiver's May 27, 2011 Statements................................................... 6

   K.    Interstate Executes Restoration Contract and Completes
         Restoration Work .............................................................................. 7

III.     ARGUMENT ........................................................................................... 8

   A.    Legal Standard .................................................................................. 8

   B.    Triable Issues of Fact Support Interstate's Concealment Claims........... 8

         1.    The Receiver Owed Interstate A Duty To Disclose .................... 9

         2.    The Receiver Intended to Defraud Interstate............................. 14

         3.    Interstate Justifiably Relied on the Receiver's Omissions ......... 15

         4.    The Receiver's Concealments Caused Interstate's Harm .......... 16

   C.    Triable Issues of Fact Support Interstate's Claims for Intentional
         Misrepresentation............................................................................ 17

         1.    The Receiver's May 4, 2011 Statement Was False.................... 17

         2.    The Receiver's May 5, 2011 Statement Was False.................... 18

         3.    The Receiver's May 27, 2011 Statement Was False................. 18

PLAINTIFF INTERSTATE RESTORATION, LLC'S OPPOSITION
TO THE RECEIVER'S MOTION FOR SUMMARY JUDGMENT

D.   Triable Issues of Fact Support Interstate's Claims for Negligent Misrepresentation .................................................................. 21

E.   Triable Issues of Fact Support Interstate's Claims for Restitution and Constructive Trust ............................................................ 22

F.   Triable Issues of Fact Support Interstate's Damages ............................. 23

G.   Punitive Damages Should Be Reserved For the Jury ............................ 24

IV.   CONCLUSION ........................................................................................... 25

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Federal Cases**

4

5

*Adickes v. S.H. Kress & Co.*,
    398 U.S. 144 (1970) ........................................................................ 8

6

7

*Aloe Vera of Am., Inc. v. U.S.*,
    699 F.3d 1153 (9th Cir. 2012) ........................................................ 8

8

9

*Baumgartner v. United States*,
    322 U.S. 665 (1944) ...................................................................... 19

10

11

*Bolus v. Morrison Homes, Inc.*,
    No. 8:08-cv-1957, 2009 U.S. Dist. LEXIS 23370 (M.D. Fla. Mar. 12, 2009) .. 20

12

13

*Bor Pha v. Yia Yang*,
    No. 12-CV-01580, 2013 WL 4546362 (E.D. Cal. Aug. 27, 2013) .............. 16, 21

14

15

*Britz Fertilizers, Inc. v. Bayer Corp.*,
    665 F. Supp. 2d 1142 (E.D. Cal. 2009) ........................................... 16

16

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ........................................................................ 8

17

18

*Elias v. Hewlett-Packard Co.*,
    No. 12-CV-00421-LHK, 2014 WL 493034 (N.D. Cal. Feb. 5, 2014.) ........ 10, 11

19

20

*In re First Alliance Mortgage Co.*,
    No. CV 01-971 DOC, 2003 WL 21530096 (C.D. Cal. June 16, 2003) ............ 25

21

22

*Johnson v. Harley-Davidson Motor Co. Grp., LLC*,
    285 F.R.D. 573 (E.D. Cal. 2012)................................................... 10

23

24

*Landmark Screens, LLC v. Morgan, Lewis & Bockius LLP*,
    No. 08-2581, 2008 WL 4483817 (N.D. Cal. Oct. 2, 2008)................ 14

25

*Masson v. New Yorker Magazine, Inc.*,
    501 U.S. 496 (1991) ........................................................................ 8

26

27

*Nat'l Union Fire Ins. Co. of Pittsburg, PA v. Res. Dev. Servs., Inc.*,
    No. 5:10-CV-01324, 2011 WL 1882274 (N.D. Cal. May 17, 2011) ................ 10

28

ii

PLAINTIFF INTERSTATE RESTORATION, LLC'S OPPOSITION
TO THE RECEIVER'S MOTION FOR SUMMARY JUDGMENT

*Tait v. BSH Home Appliances Corp.*,
   No. 10-00711 DOC, 2011 WL 3941387 (C.D. Cal. Aug. 31, 2011) ................ 12

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Products Liab. Litig.*,
   754 F. Supp. 2d 1145 (C.D. Cal. 2010) ............................................................ 11

**State Cases**

*American Airlines, Inc. v. Sheppard, Mullin*,
   96 Cal. App. 4th 1017 (2002) ............................................................................ 24

*Blankenheim v. E. F. Hutton & Co.*,
   217 Cal. App. 3d 1463 (1990) .......................................................................... 15

*Borba v. Thomas*,
   70 Cal. App. 3d 144 (1977) .............................................................................. 18

*Hobart v. Hobart Estate Co.*,
   26 Cal. 2d 412 (1945) (en banc) ...................................................................... 24

*Lingsch v. Savage*,
   213 Cal. App. 2d 729 (1963) ......................................................................... 9, 10

*Nathanson v. Murphy*,
   132 Cal. App. 2d 363 (1955) ............................................................................ 10

*OCM Principal Opportunities Fund v. CIBC World Markets Corp.*,
   157 Cal. App. 4th 835 (2007) ...................................................................... 15, 21

*Ogundare v. Dep't of Indus. Relations, Div. of Labor Standards Enforcement*,
   214 Cal. App. 4th 822 (2013) .......................................................................... 14

*San Francisco Design Ctr. Associates v. Portman Companies*,
   41 Cal. App. 4th 29 (1995) .............................................................................. 13

*Shearer v. Cooper*,
   21 Cal. 2d 695 (1943) (en banc) ...................................................................... 24

*Spinks v. Equity Residential Briarwood Apartments*,
   171 Cal. App. 4th 1004 (2009) ........................................................................ 25

*Stevens v. Superior Court*,
   180 Cal. App. 3d 605 (1986) ........................................................................... 25

*Warner Constr. Corp. v. City of Los Angeles,*
  2 Cal. 3d 285 (1970) ............................................................................. 13

**Federal Statutes**

Federal Rules of Civil Procedure Rule 56 ..................................................8, 15, 22

**State Statutes**

Cal. Civ. Code § 3294(c)(3) ............................................................................24, 25

**Other Authorities**

5 Witkin, Summary of California Law 10th (2005) .............................13, 17, 20, 22

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

## I. INTRODUCTION

Defendant Thomas A. Seaman ("Receiver") obtained hundreds of thousands of dollars of insurance proceeds intended to compensate Plaintiff Interstate Restoration, LLC ("Interstate") for work it did to repair a property the Receiver was trying to sell as part of a Loan sale.  The Receiver knew Interstate was relying on the insurance funds for payment, and even insisted Interstate agree by contract to rely exclusively on such insurance funds.  But rather than use the insurance funds for their intended and agreed purpose the Receiver, acting unilaterally and unbeknownst to Interstate, decided to credit them to the purchase price of the Loan because he knew the purchaser did not have the money to close the deal.  Of course, this also meant that no one would have the money to pay Interstate, but the Receiver cared only about selling the Loan and, in his own words, "didn't really care" where he got the money to do so.

Until he sold the property, the Receiver worked directly with Interstate, all the while diligently concealing the acts by which he appropriated the earmarked insurance funds for another purpose.  The Receiver also consistently and repeatedly misrepresented to Interstate what he was doing with the funds and, even after using them for the real estate transaction, falsely told Interstate he had transferred the funds to the purchaser for payment to Interstate. The Receiver's concealments and misrepresentations caused Interstate to perform work for which it was not paid more than $1.2 million.  The evidence of the Receiver's misconduct demonstrates triable issues for the jury, and the Court should deny the Motion for Summary Judgment ("Motion") in its entirety.

## II. FACTUAL BACKGROUND

### A. <u>Receiver's Efforts to Sell the Loan to NuView</u>

The Receiver's sole objective was to sell the Trace Loan and bring funds into the receivership estate, (SGD 82), but the Loan was difficult to sell because the

1

1  Trace Facility was defunct and contained radioactive material.  (SGD 83.)  The
2  Receiver hired a broker to market the Loan but his efforts were unsuccessful, (SGD
3  84), and the only interested buyer was NuView, whom the Receiver had previously
4  hired to manage the Trace Facility.  (SGD 85.)

5     The Receiver knew all along that NuView was unable to raise funds to
6  purchase the Loan.  In April 2010, NuView and the Receiver entered an agreement
7  for NuView to purchase the Loan for $2.5 million, with a $250,000.00 down
8  payment due in 30 days.  (SGD 86.)  NuView failed to pay the down payment
9  despite multiple extensions.  (SGD 87.)  In November 2010, the Receiver reduced
10  the purchase price to $1.5 million, provided that NuView close the sale within 90
11  days.  (SGD 88.)  On March 4, 2011, the Receiver and NuView entered an
12  agreement whereby NuView Molecular would purchase the Loan for $1.5 million,
13  with an immediate deposit of $250,000.00 ("March 4th Agreement").  (SGD 89.)
14  The agreement, at the Receiver's suggestion, also gave the Receiver a 5 percent
15  ownership interest in NuView Molecular upon closing.  (SGD 90.)

16     **B.**     **Flood at the Trace Facility**

17     After the flood at the Trace Facility, the Receiver approved the hiring of
18  Interstate to perform demolition and restoration work.  (SGD 91.)  Interstate is a
19  national insurance restoration contractor.  Its business model is to work exclusively
20  for commercial property owners with insurance coverage to pay for Interstate's
21  work.  (SGD 92).  Accordingly, the Receiver, Crowe, and Interstate all understood
22  that Interstate's work at the Trace Facility would be paid for by proceeds from the
23  insurance carrier.  (SGD 93.)  The Receiver was loss payee under the insurance
24  policy.  (SGD 24.)  The Receiver repeatedly told Interstate that the insurance carrier
25  would pay the insurance proceeds to the Receiver as loss payee, and the Receiver
26  would pay Interstate.  (SGD 94.)

27     **C.**     **Interstate Performs Demolition Work**

28     Interstate performed two phases of demolition work, and began each with the

Receiver's approval.  (SGD 95).  Trace only signed the demolition contracts with the Receiver's approval.  (SGD 96.)  The Receiver acknowledged the demolition contracts as lender.  (SGD 27.)  Confirming all parties' understanding, before signing the second demolition contract, the Receiver required Interstate to revise the contract to clarify that Interstate would be paid exclusively from insurance proceeds. (SGD 97.)  Demolition work concluded on or about March 14, 2011.  (SGD 98.)

### D.   Receiver Deposits Insurance Funds for Interstate's Work

On March 19, 2011, the insurance adjuster informed the Receiver, Crowe, and Interstate that the insurer had approved an initial claim advance of $995,465.85. (SGD 99.)  The advance covered: **(1)** Dalworth's limited work ($46,723.87); **(2)** Interstate's phase one demolition work ($95,000.00); **(3)** 80 percent of Interstate's phase two demolition work ($88,680.00); **(4)** part of Interstate's impending restoration work ($775,061.98); and **(5)** less a $10,000.00 policy deductible.  (*Id.*) On March 31, 2011, the insurer issued a check for $995,465.85, (SGD 28), which the Receiver deposited in its account on April 21, 2011.  (SGD 30.)

### E.   Receiver Amends Loan Sale Contract to Obtain Discretion to Credit Insurance Funds

Following the March 4th Agreement, Crowe weekly informed the Receiver that NuView had not secured funds to satisfy the remaining $1.25 million on the purchase price of the Loan.  (SGD 100.)  As of March 17, 2011, the Receiver knew that NuView had only $44,351.00 in a bank account.  (SGD 101.)  Neither the Receiver nor anyone else ever informed Interstate that, as of this time, NuView had not secured any funds beyond its deposit to pay the $1.5 million purchase price of the Loan.  (SGD 102.)

Wishing to "wash his hands" of the asset, the Receiver suggested to Crowe "that if [Crowe] wanted to buy this facility and [was] still having difficulties raising the capital, that [the Receiver] would facilitate the transaction using the funds that they had on deposit as a credit against the purchase price."  (SGD 103.)  Thus the

1  Receiver proposed to amend the March 4th Agreement by inserting Section 8.16,
2  (SGD 104), which authorized the Receiver, in his sole discretion, to apply any
3  insurance proceeds as a credit against the purchase price of the Loan instead of
4  paying them to Interstate as agreed.  (SGD 12.)  On March 31, 2011, the Receiver
5  and NuView executed an Amended Purchase and Sale Agreement containing
6  Section 8.16 ("Loan Sale Contract").  (SGD 11.)  No one ever informed Interstate
7  that the Receiver had given himself discretion to use the insurance money for a
8  purpose other than paying Interstate.  (SGD 105.)

9       **F.**     **Receiver And Interstate Negotiate Restoration Work**

10       Contrary to the Receiver's argument, he was directly involved in negotiating
11  Interstate's restoration work and contract.  On February 22, 2011, Interstate sent the
12  Receiver a sample restoration contract per its request.  (SGD 106.)  On March 23,
13  2011, the Receiver requested an estimate of the work scope and pricing and stated
14  he was prepared to authorize the work in pieces.  (SGD 107.)  On March 30, 2011,
15  Interstate issued a draft contract to Trace and the Receiver.  (SGD 37.)  On April 4,
16  2011, the Receiver said he would review the contract and asked Interstate to send
17  the scope of work approved by the insurance adjuster and cost consultant.  (SGD
18  108.)  On April 19, 2011, at the Receiver's request, Interstate sent a revised contract
19  clarifying that that Interstate was relying exclusively on insurance proceeds to be
20  paid.  (SGD 109.)  Meanwhile, with the Receiver's approval, Interstate commenced
21  preliminary aspects of the restoration work.  (SGD 41-42.)

22       **G.**     **Receiver Decides to Credit Any Remaining Insurance Funds**

23       On April 26, 2011, the Court approved the Loan Sale Contract.  (SGD 17.)
24  On April 27, 2011, the Receiver sent Crowe an estimate of the debits and credits for
25  NuView's purchase of the Loan.  (SGD 110.)  The estimate included a credit of
26  **$948,741.98** for "Flood Insurance Proceeds," (*Id.*) which represented all the
27  insurance proceeds the Receiver "held in trust" to pay for the work that "was
28  completed or to be done by Interstate."  (SGD 111.)  Indeed, by this time, the

1  Receiver had decided that "whatever amount [of insurance funds] was in the trust

2  account as of the closing date would be credited." (SGD 112.) Neither the Receiver

3  nor anyone else ever informed Interstate of the Receiver's decision on April 27,

4  2011 to credit all insurance funds remaining at closing. (SGD 113.)[1]

5  ## H.    Receiver's May 4-5, 2011 Statements

6      On May 4, 2011, Interstate submitted a bill to the Receiver for a $526,125.71

7  down payment for the restoration work. (SGD 45.) The Receiver replied that he

8  had the funds for the down payment, but "just needed" Trace to sign the restoration

9  contract to release the funds to Interstate, (SGD 47), without disclosing Crowe had

10  instructed him earlier that day not to release the funds. (SGD 116.)

11      On May 5, 2011, Interstate's attorney, Dale Coplan, inquired about the

12  insurance funds. (SGD 52.) The Receiver told Coplan that he had the insurance

13  funds, was in the process of selling the Loan to NuView, and as part of that sale,

14  would transfer all the insurance funds to Crowe. (SGD 54.) Coplan clarified that

15  "all of the money that you have will be transferred to Paul Crowe and Paul Crowe

16  will have available all of the insurance proceeds to pay [Interstate]," and the

17  Receiver unequivocally confirmed that statement was correct. (*Id.*) However, the

18  Receiver knew this was untrue because NuView had not yet secured any funds

19  beyond its $250,000.00 down payment and the Receiver had already decided to use

20  Interstate's insurance funds to cover the purchase price. (SGD 117.) No one

21  disclosed these critical facts to Interstate. (SGD 118.)

22      Although the Receiver initially expected the Loan Sale to close on May 6,

23  2011, he gave Crowe an extension to "get his financing in order." (SGD 119.) On

24  ---

[1]  The Receiver's April 27, 2011, decision to credit all insurance proceeds

25  remaining at closing was memorialized in an "Estimated Settlement Statement"

26  generated the next day by the title company based on information from the Receiver.
   The Statement lists a $948,741.00 credit for "Additional Insurance Proceeds

27  Received Seller." (SGD 114.) Neither the Receiver nor anyone else told Interstate

28  about the Estimated Settlement Statement. (SGD 115.)

May 4, 2011, the Receiver told Crowe that he planned to disburse **$183,680.00** to Interstate, but would not release any more funds to pay Interstate.  Since this reduced the available credit of insurance proceeds from **$948,741.98** to **$765,061.98,** the Receiver told Crowe that he needed to raise $370,000.00 to purchase the Loan.  (SGD 120.)  Thus the Receiver knew the insurance funds would be used as a credit against the balance of the purchase price.  (*Id.*)  Nobody ever informed Interstate of the Receiver's decision on May 5, 2011, to credit the remaining $765,061.98 in insurance proceeds.  (SGD 121.)

| Date | Tells Interstate: | In Fact: |
|---|---|---|
| May 4 | Has insurance funds, just needs signed contract to release funds to Interstate.  (SGD 47) | Decided to credit all remaining insurance funds to cover half of purchase price.  (SGD 120.) |
| May 5 | Will transfer all insurance funds to NuView so it can pay Interstate.  (SGD 54.) | Decided to credit all remaining insurance funds to cover half of purchase price.  (SGD 120.) |

## I.    Receiver Credits the Insurance Funds In The Loan Sale

Crowe notified the Receiver that NuView had raised $500,000.00 from two investors, but still lacked funds for half of the $1.5 million purchase price.  (SGD 122.)  The Receiver decided to close the Loan Sale on May 17, 2011, and applied the remaining insurance funds (**$765,061.98**) as a credit against the purchase price.[2] (SGD 123.)  Neither the Receiver nor anyone else ever told Interstate the Receiver had credited the insurance funds to the Loan Sale.  (SGD 124.)

## J.    Receiver's May 27, 2011 Statements

On or about May 25, 2011, Interstate received the restoration contract signed by Trace and acknowledged by NuView Molecular.  (SGD 125.)  On May 27, 2011,

---

[2]   On May 13, 2011, the Receiver paid Interstate $183,680.00 for part of the demolition work.  (SGD 32.)  Thus, the Receiver still had $765,061.98 of insurance proceeds in its account at the time of closing.

3088649.6

6

Interstate sent an email to Trace and the Receiver asking the Receiver to release the insurance proceeds for the down payment. (SGD 59.)  In response, the Receiver sent an email stating that the Receiver had transferred its interests in Trace to NuView, the Receiver "has no remaining interest in the loans or property owned by Trace," "all insurance funds have been transferred to NuView," and Interstate should "contact Paul Crowe of NuView regarding this loan and the insurance claim." (SGD 61.)   Even the Receiver's own staffer, Seth Timmons, testified that this statement was false:  The Receiver had not "transferred" the funds but, instead, had credited them to the purchase price, keeping them in the receivership and making them unavailable for their intended and agreed purpose of paying Interstate. (SGD 150.)  Once again the Receiver disguised the truth from Interstate:

| Date | Tells Interstate: | In Fact: |
|------|-------------------|----------|
| **May 27** | Transferred all insurance funds to NuView.  (SGD 61.) | Credited all remaining insurance funds to cover half of purchase price.  (SGD 124.) |

K.   **Interstate Executes Restoration Contract and Completes Restoration Work**

On or about May 31, 2011, Interstate countersigned and fully executed the restoration contract ("restoration contract"). (SGD 126.)  At the time, Interstate was unaware of the Receiver's decision to credit the insurance funds. (SGD 127.) Interstate completed the restoration work in September 2011 at a total cost of $2,715,331.84. (SGD 128.)  Interstate did not learn that the Receiver had credited the insurance proceeds until six months later, in November 2011, when it first saw a copy of the final closing statement. (SGD 129.)  Interstate still has not been paid for $1,246,000.88 of its work under the restoration contract. (SGD 130.)

## III.   ARGUMENT

### A.   Legal Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is improper where the evidence reveals a genuine issue of material fact.  A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  If the moving party fails to discharge this initial burden, summary judgment must be denied and the court need not consider the non-moving party's evidence.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

"In deciding whether to grant summary judgment, 'the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'"  *Aloe Vera of Am., Inc. v. U.S.*, 699 F.3d 1153, 1165 (9th Cir. 2012) (citation omitted).  The evidence of the non-movant is assumed to be correct, and all reasonable inferences are to be drawn in his favor, *id.*, "including questions of credibility and of the weight to be accorded particular evidence," *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 521 (1991).

### B.   Triable Issues of Fact Support Interstate's Concealment Claims

The Receiver concedes that he never disclosed to Interstate the following material facts:  **(1)** his discretion to credit the insurance proceeds in the Loan Sale, **(2)** his decisions on April 27, 2011 and May 5, 2011, to credit all insurance proceeds remaining in his custody at the Loan Sale closing, **(3)** that he credited the insurance proceeds at closing, and **(4)** NuView's inability at all times to pay for the majority of the purchase price on the Loan (hereinafter, "Concealed Facts").[3]  (SGD 102, 105, 113, 115, 118, 121, 124.)  Nor does the Receiver dispute that the Concealed Facts were material to Interstate, which was relying solely on the insurance funds for

---

[3]   Indeed, the Receiver knew that after the insurance funds were credited, NuView only netted a cash payment of $91,221.32 from escrow.  (SGD 140.)

8

payment and would not have done the work if it had known the true facts.  (SGD 93, 97, 109, 143.)

In addition to these uncontested facts, Interstate's concealment claims withstand summary judgment because there is clear evidence of duty to disclose, intent to defraud, justifiable reliance, and resulting damages.

### 1.  The Receiver Owed Interstate A Duty To Disclose

The Receiver had a duty to disclose the Concealed Facts to Interstate because he **(1)** had a transactional relationship with Interstate; **(2)** had exclusive knowledge of the material concealed facts; and **(3)** failed to disclose material facts that qualified his partial representations.

#### a.  *The Receiver's Duty to Disclose Arose From A Transactional Relationship with Interstate*

The Receiver was an indispensable party to this transaction.  Work could not start, and funds could not be released, without his consent.  (SGD 41-42, 94-95.) The Receiver approved the hiring of Interstate, signed the demolition contracts as lender, negotiated revisions to the contracts, authorized demolition and restoration work, held as loss payee the insurance funds, and used a portion of the insurance funds to pay for the demolition work.  (SGD 24, 27, 32, 37, 41-42, 91, 94-95, 97, 106-109.)  The Receiver understood that the insurer would pay the insurance funds to the Receiver as loss payee, and the Receiver "holds in trust the money . . . until the contractor has completed its repairs and then pays the contractor directly." (SGD 131.)

These facts establish that the Receiver entered into a transactional relationship with Interstate regarding the restoration work.[4]  *Cf. Lingsch v. Savage*, 213 Cal.

---

[4]   There is no authority for the Receiver's view that the relationship must be the "subject of the nondisclosure."  Even if this were the test, the primary subject of the nondisclosures was the insurance funds.  As loss payee, the Receiver and Interstate clearly had a relationship as to the insurance funds.

9

App. 2d 729, 736 (1963) (seller's real estate broker is a "party to a business transaction" with the buyer, giving rise to duty to disclose); *Nat'l Union Fire Ins. Co. of Pittsburg, PA v. Res. Dev. Servs., Inc.*, No. 5:10-CV-01324, 2011 WL 1882274, at *5 (N.D. Cal. May 17, 2011) (transactional relationship alleged where trucking companies dumped waste at plaintiff's landfill, knowing that plaintiff permitted them to do so in the mistaken belief that the loads were paid for).  Further, that the Receiver did not sign the restoration contract does not preclude a transactional relationship, for "[a]n action for deceit does not require privity of contract."  *Nathanson v. Murphy*, 132 Cal. App. 2d 363, 368 (1955); *see also Lingsch v. Savage*, 213 Cal. App. 2d at 736.

           b.     *Receiver Had Exclusive Knowledge of Concealed Facts*

Courts do not require literal exclusivity of knowledge to support a duty to disclose but rather, examine whether the defendant had "superior" knowledge of the concealed fact.  *Johnson v. Harley-Davidson Motor Co. Grp., LLC*, 285 F.R.D. 573, 583 (E.D. Cal. 2012).  Thus, a defendant has exclusive knowledge of facts giving rise to a duty to disclose when "he knew of the [fact] while plaintiff did not, and given the nature of the [fact], it was difficult to discover."  *Elias v. Hewlett-Packard Co.*, No. 12-CV-00421-LHK, 2014 WL 493034, at *9 (N.D. Cal. Feb. 5, 2014.)

It is undisputed that the Receiver knew but failed to disclose to Interstate the Concealed Facts:  Interstate was not privy to the Receiver and Crowe's discussions concerning (1) amending the Loan Sale Contract to add section 8.16 (SGD 103-105); (2) the Receiver's decision to credit any insurance proceeds remaining at closing (SGD 110, 113, 115, 120-121); (3) the Receiver's decision at closing to credit the insurance funds (SGD 123-124, 129); (4) NuView's ongoing inability to raise funds (SGD 100-102, 117-119, 122-124), or (5) whether to release insurance funds (SGD 116, 120).

Interstate could not discover these facts because they arose from the Receiver's internal decisions or from private communications between the Receiver

and Crowe regarding the Loan Sale.  Notably, Interstate was literally walled off from this information because NuView was subject to a non-disclosure ("NDA") provision in its management agreement.  (SGD 132.)  Regardless of the Receiver's interpretation of the NDA,[5] Crowe testified that he never disclosed information to Interstate because he adamantly *believed* the NDA applied to all business matters with the Receiver, including the crediting of the insurance funds and the terms of the Loan Sale.  (SGD 133.)  Thus, the record is plain that the Receiver had superior knowledge of the concealed facts.[6]

Nor can Interstate be expected to hunt for information it had no reason to suspect existed.  In *Elias*, 2014 WL 493034, at *9, the court rejected defendant's argument that plaintiff could not show exclusive knowledge where information was on the Internet.  The court ruled that "[c]ustomers cannot be expected to seek facts which they h[ave] no way of knowing exist[ ]."  *Id.*  "Nor is there any reason to think that many customers, like Plaintiff, would be aware that information [regarding the concealed defect] exists, let alone is available on the internet."  *Id.*

Interstate had no reason to suspect the Receiver might use the insurance funds for any purpose other than payment for its work.  First, Interstate had never before had a project where the loss payee used the insurance proceeds for a purpose other than paying for Interstate's work.  (SGD 134.)  Nor had anyone else, including the Receiver and his staff, heard of such an improper use of insurance funds.  (SGD

---

[5]  Even the Receiver's definition of "proprietary information" – information  "[o]f or relating to a proprietor" – plainly covers the concealed facts, which directly concern the sale of the loan and facilities of the proprietor, Trace.

[6]  At bottom, that the Receiver shared information with NuView or an escrow agent does not alter the Receiver's superior knowledge relative to Interstate.  *See In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Products Liab. Litig.*, 754 F. Supp. 2d 1145, 1192 (C.D. Cal. 2010) (exclusive knowledge not precluded by fact that defendant shared concealed fact with government agency, since the defendant "remained in a superior position of knowledge").

135.)  Interstate also had no reason to mistrust the Receiver, who was an officer of the Court and held himself out as an impartial lender and loss payee.  (SGD 6, 24, 27, 94, 109, 136.)  And even if Interstate had an inkling that the Receiver might misuse the insurance proceeds – which it did not – Interstate had no reason to be aware that such information would be posted on the Receiver's website.[7]  The Receiver admitted that "every document that was ever filed" is posted on his website and "there [are] probably hundreds of them."  (SGD 139.)  Given the volume of paperwork, the Receiver's argument that Interstate should have presciently clicked through hundreds of pages to find the concealed facts defies reason, and certainly does not prevent a jury from concluding that the Receiver had exclusive knowledge.  *See Tait v. BSH Home Appliances Corp.*, No. 10-00711 DOC, 2011 WL 3941387, at *3 (C.D. Cal. Aug. 31, 2011) ("[T]he fact that information about consumer complaints may have been available on the internet does not negate a claim for fraudulent omission. . . . Many customers would not have performed an internet search before beginning a [product] search. Nor were they required to do so.").

> c.   *The Concealed Facts Materially Qualify and Render Misleading the Receiver's Partial Representations*

On May 4, 2011, May 5, 2011, and May 27, 2011, the Receiver made partial representations to Interstate by concealing facts that "materially qualif[ied] the facts

---

[7]   The record is clear that nobody at Interstate had looked at the Receiver's website between February and December 2011.  (SGD 137.) The Receiver raised in depositions an email to Interstate's Dan Dansby from an insurance adjuster with a link to the Receiver's website.  The email had the subject line: "when nothing to do," and with no body text except the link.  (SGD 19.)  Given the subject line and the volume of emails he receives, Dansby reasonably did not click on the link.  (SGD 138.)  There was nothing in the email that would have alerted Dansby to the need to search the website regarding the insurance proceeds.  (SGD 19.)

1   disclosed, *or* which render[ed] his disclosure likely to mislead." *Warner Constr.*

2   *Corp. v. City of Los Angeles*, 2 Cal. 3d 285, 294 (1970) (emphasis added).

3          On May 4, 2011, the Receiver told Interstate that he had the insurance funds

4   for the restoration down payment, but "just needed" Trace to sign the restoration

5   contract to release the funds to Interstate.  (SGD 47.)[8]  The Receiver, however,

6   concealed his earlier decision to credit the insurance funds against the balance of the

7   purchase price, since NuView would only be contributing a fraction of it.  (SGD

8   113, 115, 118, 121.)  Likewise, the Receiver's May 5, 2011 statement[9] that he would

9   transfer all insurance funds for restoration work to NuView, *such that NuView will*

10  *have available all the insurance funds to pay Interstate*, (SGD 54), concealed his

11  decision to credit the remaining insurance funds against the purchase price.  (SGD

12  113, 115, 118, 121.)  These facts materially qualified the partial statements because

13  they showed that the insurance funds would be exhausted in the Loan Sale and thus

14  would not be made available to NuView in the manner the Receiver stated.

15         The Receiver's May 27, 2011 statement was also a partial representation.

16  When the Receiver stated that all the insurance funds had been "transferred" to

17  NuView, he suppressed the fact that the insurance funds had been credited in the

18  Loan Sale, and that NuView, having exhausted its cash and the insurance funds to

19  _____

20  [8]   The Receiver contends the statement that he "just needed" Trace to sign the

21  restoration contract to release the funds, was not an affirmation of fact.  That is
    incorrect:  "[A] statement of what the defendant . . . intends to do relates to an

22  existing state of mind, and is a *representation of fact*."  5 Witkin, Summary of Cal.

23  Law (10th Ed. 2005) Torts, § 781, p. 1131 (emphasis added).  The Receiver cites no
    authority for the strained notion that in the concealment context, the partially

24  disclosed fact must be one of past or existing fact.  *San Francisco Design Ctr.*

25  *Associates v. Portman Companies*, 41 Cal. App. 4th 29, 44 (1995), only addressed
    affirmative misrepresentation claims, not concealment claims.

26
    [9]   The Receiver's statement of intent to transfer the insurance funds to NuView was

27  an affirmation of fact because it related to his then-existing state of mind.  5 Witkin,

28  Summary of Cal. Law (10th Ed. 2005) Torts, § 781, p. 1131.

purchase the Loan, only netted $91,221.32 from escrow. (SGD 61, 124, 140.) These facts were material because they affected whether NuView would have available funds to pay Interstate and whether Interstate would do the work.

For all these reasons, the evidence demonstrates that the Receiver had a duty to disclose the concealed facts.

## 2. The Receiver Intended to Defraud Interstate[10]

The Receiver had a motive to induce Interstate to proceed with the restoration work.[11] Eager to dispose of the Loan, and aware of NuView's consistently failed fundraising, the Receiver added Section 8.16 to use insurance funds in lieu of funds received from NuView. (SGD 11-12, 82-87, 103-104.) The Receiver benefitted from Interstate's ignorance of this provision, and from Interstate proceeding with the restoration work, so that the insurance funds would remain available as a credit. Further, the Receiver admits that Interstate's completion of the restoration work was a necessary step toward the success of NuView Molecular, and that he retained the 5% ownership interest in case the company did in fact succeed. (SGD 141.)

Contrary to the Receiver's argument, the mere fact that he posted content on the Internet does not vitiate intent to induce conduct. Neither the Receiver nor anyone on his staff ever told Interstate about the website. (SGD 142.) The Receiver knew that Interstate would have to wade through hundreds of pages to find any clue

---

[10]  Intent to defraud may be shown by circumstantial evidence. *See Ogundare v. Dep't of Indus. Relations, Div. of Labor Standards Enforcement*, 214 Cal. App. 4th 822, 832 (2013). "[I]ntent to defraud in a concealment case effectively means intent to *induce conduct*-action or inaction-that differs from what the plaintiff would have done if informed of the concealed fact." *Landmark Screens, LLC v. Morgan, Lewis & Bockius LLP*, No. 08-2581, 2008 WL 4483817, at *8 (N.D. Cal. Oct. 2, 2008) (internal quotation marks omitted)

[11]  The Receiver's view that he "would receive no direct benefit whatsoever" from defrauding Interstate is a red herring. The Receiver's hourly fees only relate to his personal benefits. In his official capacity, the Receiver clearly stood to benefit from defrauding Interstate for the reasons explained.

1   of concealed facts which it had no reason to suspect existed.  (SGD 139.)  If

2   anything, this corroborates his motive to induce Interstate to proceed with the

3   restoration work, and further illustrates a triable issue of intent to defraud.

**3.      Interstate Justifiably Relied on the Receiver's Omissions**

5   Summary judgment is disfavored on the element of reliance.  *Blankenheim v.*

6   *E. F. Hutton & Co.*, 217 Cal. App. 3d 1463, 1475 (1990) ("Except in the rare case

7   where the undisputed facts leave no room for a reasonable difference of opinion, the

8   question of whether a plaintiff's reliance is reasonable is a question of fact.").

9   Reliance is only unreasonable as a matter of law if the facts leave no room for

10  debate as to whether the plaintiff's conduct, in light of his information and

11  intelligence, was "manifestly unreasonable."  *OCM Principal Opportunities Fund v.*

12  *CIBC World Markets Corp.*, 157 Cal. App. 4th 835, 864-65 (2007).  It must appear

13  beyond dispute that the plaintiff "put faith in representations that were preposterous

14  or shown by facts within his observation to be so patently and obviously false that

15  he must have closed his eyes to avoid discovery of the truth."  *Id.* at 865 (internal

16  quotation marks omitted).

17  The evidence shows that Interstate actually relied on the Receiver's

18  omissions:  Had Interstate been informed of the Concealed Facts and known the

19  Receiver had kept the insurance funds, it would not have signed the restoration

20  contract or proceeded with the work.  (SGD 143).  *See id.* at 863-64.[12]

21  Further, Interstate's reliance on the Receiver's omissions was reasonable and

22  far from "preposterous."  Interstate justifiably believed the Receiver was a

23  disinterested officer of the Court, whose principal role as loss payee was to hold the

24  insurance funds "in trust" and to pay them to Interstate for its work.  (SGD 131,

25  136.)  The Receiver on several occasions held himself out as merely the lender and

---

[12]   Since the Receiver does not challenge Interstate's "actual reliance" on the Receiver's omissions (Mot. at 20:5-26), he fails to meet his initial burden under FRCP 56 on this issue.

loss payee.  (SGD 24, 27, 94, 109.)[13]  Therefore Interstate reasonably believed that the Receiver was "an officer of the court with really no axe to grind."  (SGD 136.)[14]  *Cf.* Restatement (Second) of Torts § 543 cmt. (a) (1977) (plaintiff is justified in relying upon fraudulent misrepresentation if it comes from a person whom the plaintiff reasonably believes to be disinterested, even if that belief is mistaken).

Nor did Interstate have any reason to suspect that the Receiver would use the insurance proceeds for a purpose other than paying Interstate.  As discussed *supra* Section III(B)(1)(b), none of the witnesses in this case, including Interstate and the Receiver, had ever before encountered a situation where the loss payee used insurance proceeds for a purpose other than paying for the covered work.  (SGD 134-135.)  Even Trace's employee, Dr. Ian Horn, testified that he was "shocked" when he learned that the Receiver had credited the insurance funds because the funds were "encumbered" in that "they were paid out specifically for the work that Interstate was performing."  (SGD 145.)  Thus Interstate had no reason to question that the Receiver might credit the insurance proceeds, or suspect that the Receiver would suppress material facts about them.

### 4.  The Receiver's Concealments Caused Interstate's Harm

The Receiver's concealments were a substantial factor in causing Interstate's harm.  *See* CACI 1901; *Bor Pha v. Yia Yang*, No. 12-CV-01580, 2013 WL 4546362, at *4 (E.D. Cal. Aug. 27, 2013).[15]  Had the Receiver disclosed the crediting of the

---

[13]  The Receiver's argument that he distanced himself from the restoration contract after May 5, 2011, does not change his position as loss payee.  If anything, the fact that the Receiver stated "he would not be a part of the restoration work transaction" only bolsters Interstate's belief that the Receiver was an impartial party.

[14]  Interstate had no idea at the time that the Receiver expected to receive, and did secure, an equity stake in NuView Molecular, particularly since the Receiver lied and said he did not retain any interests in the new company.  (SGD 61, 90, 144.)

[15]  A substantial factor need not be the " 'sole' or exclusive cause of the damages," *Britz Fertilizers, Inc. v. Bayer Corp.*, 665 F. Supp. 2d 1142, 1168 (E.D. Cal. 2009).

1   insurance proceeds and NuView's inability to pay for the Loan independently of the

2   insurance proceeds, Interstate would not have signed the restoration contract or

3   continued work on the project, much less completed the restoration work.  (SGD

4   143.)  However, by concealing these facts, the Receiver led Interstate to believe that

5   it would be paid with funds that, in reality, the Receiver already had allocated to

6   another purpose.  (SGD 146.)  Thus the Receiver induced Interstate to enter the

7   restoration contract with a party who lacked the funds to pay and to perform the

8   work, resulting in a loss of $1,246,000.88.  (SGD 130.)  A jury could properly

9   conclude on these facts that the Receiver's misconduct was a substantial factor in

10  causing Interstate's loss.  For all of the foregoing reasons, the Receiver is not

11  entitled to summary judgment on Interstate's concealment claims.

12      **C.**   **Triable Issues of Fact Support Interstate's Claims for Intentional**

13           **Misrepresentation**

14           **1.**    **The Receiver's May 4, 2011 Statement Was False**

15      The Receiver's statement that he "just needed" Trace to sign the restoration

16  contract to release the funds to Interstate, (SGD 47), was fraudulent because it

17  implied facts that the Receiver knew were false.  While it is true that "predictions or

18  representations as to what will happen in the future are normally treated as opinions

19  . . . sometimes they may be interpreted as implying knowledge of facts that make the

20  predictions probable."  5 Witkin, Summary of Cal. Law (10th Ed. 2005) Torts, §

21  776(3), p. 1126 (citing Restatement (Second) Torts § 525 cmt. (f)).

22      Here, the Receiver's May 4, 2011 statement was an implied statement that,

23  apart from a signed restoration contract, the Receiver knew of nothing else that

24  would impede the release of the insurance funds to Interstate.  This was

25  demonstrably false, however, because the Receiver knew of his decision on May 4,

26  2011 to credit the remaining insurance funds, such that NuView would only need to

27  contribute a fraction of the price  to purchase the Loan.  (SGD 120.)  This made it

28  impossible that any insurance funds would be released to Interstate because the

PLAINTIFF INTERSTATE RESTORATION, LLC'S OPPOSITION
TO THE RECEIVER'S MOTION FOR SUMMARY JUDGMENT

1  funds would be exhausted as a credit in the Loan Sale.  Therefore, the Receiver's

2  implied statement that, apart from a signed contract, no other circumstances would

3  affect the release of insurance funds to Interstate, was a misrepresentation.

### 2.    The Receiver's May 5, 2011 Statement Was False

5      The Receiver's May 5, 2011 statement to Interstate's attorney was also false.

6  By confirming to Interstate that "all of the money that [the Receiver has] will be

7  transferred to Paul Crowe and Paul Crowe will have available all of the insurance

8  proceeds to pay [Interstate]" (SGD 54), the Receiver implied he knew of nothing

9  that would prevent the insurance funds from being placed at Crowe's disposal for

10  payment to Interstate.  This was false because the Receiver had previously decided

11  that the insurance funds would be credited in the Loan Sale, and NuView, having

12  failed to raise funds, would only be required to pay for a fraction of the purchase

13  price.  (SGD 110-112, 114, 117, 119-120.)  Thus the Receiver knew that the

14  insurance proceeds would be exhausted to purchase the Loan, and would be

15  unavailable to NuView to pay Interstate.[16]

### 3.    The Receiver's May 27, 2011 Statement Was False

17      The Court should reject the Receiver's invitation to view his May 27

18  statement in the light most favorable to him, turning the summary judgment

19  standard on its head.  When properly viewed in the light most favorable to Interstate,

20  the evidence demonstrates a blatantly false statement, as well as scienter, falsity,

21  reliance and causation.

#### a.    *Triable Issues of Scienter and Falsity Remain*

23      The Receiver made his May 27 statement that "all insurance funds have been

---

[16]   Interstate was justified in interpreting the Receiver's implied statements on May 4 and May 5, because the Receiver had superior knowledge about the status of the insurance proceeds.  *See supra* Section III(B)(1)(b); *Borba v. Thomas*, 70 Cal. App. 3d 144, 570-71 (1977) (where defendant has superior knowledge about subject of representation, plaintiff is justified in treating prediction as "implying facts which justify a belief in the truth of the opinion").

transferred to NuView" with clear knowledge of its falsity.  *See Baumgartner v. United States*, 322 U.S. 665, 666 (1944) .  In context, it was obvious among the parties that "transfer" was understood as it is commonly understood, i.e., as a complete change in control.  On May 5, 2011, the Receiver had already explained to Interstate's attorney that all the funds would be "transferred" to Crowe *in the sense that* Crowe would have all the funds *available* to pay Interstate.  (SGD 54.) Moreover, Interstate, Crowe, and even the Receiver's own employee, Seth Timmons, all shared this literal understanding of the term "transfer."  (SGD 147.) Thus, the Receiver knew that Interstate would interpret his subsequent May 27 statement to convey a literal "transfer" of funds.

The Receiver's argument that he meant "transfer" in a different sense, and that there is no difference between the words "transfer" and "credit," is but a *post-hoc* attempt to rewrite his state of mind, which lacks credibility.  The Receiver urges the Court to accept at face value Vavak's testimony that she did not see any distinction between the terms "transfer" and "credit."  But this is a task for the jury, particularly when there is strong evidence to undermine Vavak's credibility.[17] Significantly, Seth Timmons, another employee of the Receiver, testified in deposition that the May 27 statement was "inaccurate" because the insurance funds were "credited," and not "transferred" to NuView.  (SGD 150.)  In weighing Vavak's incredible position,[18] a jury could well reject the Receiver's revisionist

---

[17]  At her deposition, Vavak clearly grasped the difference between "transfer" in the literal sense, on one hand, and in the sense she now claims – as a credit "via the closing statement."  (SGD 148.)  But later, when asked why she did not clarify to Interstate that the insurance funds had been credited, she suddenly changed her position and firmly asserted that she did not see "any potential distinction" between "transfer" and "credit."  (SGD 149.)  As any juror could see, Vavak's outright denial of any potential ambiguity is belied by her earlier testimony.

[18]  Vavak lacks credibility for other reasons: Vavak lied to Interstate when she stated on May 27 that the Receiver "has no remaining interest in the loans or

PLAINTIFF INTERSTATE RESTORATION, LLC'S OPPOSITION
TO THE RECEIVER'S MOTION FOR SUMMARY JUDGMENT

1    story and find that the Receiver understood he was conveying "transfer" in its plain

2    sense.  Because the facts create a genuine dispute as to the Receiver's credibility and

3    the meaning of this statement, this question must be reserved for the jury.[19]

4                    *b.      Triable Issues of Reliance and Causation Remain*

5            The facts demonstrate that Interstate executed the restoration contract and

6    continued the restoration work in actual reliance on the Receiver's May 27

7    statement.  Interstate's business model is to work exclusively for insurance proceeds

8    and Interstate made clear, at the Receiver's behest, that it was relying exclusively on

9    the insurance proceeds for the restoration work.  (SGD 92, 109.)  Thus if Interstate

10   had known that the insurance funds had been credited in the Loan Sale, it simply

11   would not have proceeded with the restoration work.  (SGD 143.)[20]  Instead,

12   Interstate would have stopped work and, if necessary, taken steps to terminate the

13   restoration contract pursuant to Section 19.1, which permits Interstate to terminate

14   the contract in the event the owner is delinquent on payment.  (SGD 153.)[21]

15   Accordingly, there is ample evidence that the Receiver's May 27 statement was a

16   _____

17   property owned by Trace."  (SGD 61, 90, 151.)  Both the Receiver and Vavak now
     admit that the Receiver holds an equity interest in the Trace facility.  (SGD 152.)

18   [19]   Alternatively, where, as here, the defendant utters an arguably "ambiguous

19   statement[], with a possible true or false meaning," the statement is fraudulent "if
     the false meaning was intended, or if the statement was made with either reckless

20   indifference as to how it would be interpreted or without any belief as to how it
     would be understood."  5 Witkin, Summary of California Law 10th (2005) Torts, §

21   800, p. 1157.  Vavak at least made the statement with reckless indifference as to

22   how it would be interpreted, or without any belief as to how it would be understood.

23   [20]   The Receiver's claim that Interstate was ready to "go forward" with the
     restoration work before the May 27 statement is frivolous.  Clearly if the Receiver

24   had not misrepresented facts, Interstate would not have gone forward.

25   [21]   Thus the Receiver's argument that Interstate was bound to perform the

26   restoration contract is incorrect.  And the cases cited by Receiver are distinguishable
     because the plaintiffs there did not have an "option" to stop performing.  *See Bolus*

27   *v. Morrison Homes, Inc.*, No. 8:08-cv-1957, 2009 U.S. Dist. LEXIS 23370, at *6-7

28   (M.D. Fla. Mar. 12, 2009).

"substantial factor" in Interstate's decision to proceed with the work.  *See OCM Principal*, 157 Cal. App. 4th at 864.  Moreover, Interstate's reliance on the May 27 statement was justifiable for the same reasons articulated *supra* Section III(B)(3).

With respect to causation, the Receiver's May 27 misrepresentation led Interstate to believe that insurance funds were available to pay Interstate, even though the Receiver had retained the funds for a different purpose.  (SGD 146.)  The misrepresentation caused Interstate to continue working with a party who lacked the funds to pay, leaving Interstate unpaid $1,246,000.88.  (SGD 130.)  A jury could properly conclude that the Receiver's misconduct was a substantial factor leading to Interstate's loss.  *Bor Pha v. Yia Yang*, 2013 WL 4546362, at *4.

The Receiver's entire argument rests on the alleged "undisputed fact" that Interstate fully executed the restoration contract prior to the May 27 statement.  But the evidence reveals a genuine dispute on this point:  On or about May 25, 2011, a fax was sent to Interstate transmitting a copy of the restoration contract signed by Trace and acknowledged by NuView Molecular.  (SGD 125.)  Interstate's contract manager, Kim Goss, received the fax and countersigned the contract on or about May 31, 2011, (SGD 126), with an effective date of May 27, 2011 (SGD 154).  Thus there is a triable issue that Interstate fully executed the restoration contract four days after the Receiver's false statement, which a jury should resolve.

### D.  Triable Issues of Fact Support Interstate's Claims for Negligent Misrepresentation

The Receiver's May 4, 2011 implied statement that, apart from a signed restoration contract, the Receiver knew of nothing else that would impede the release of the insurance funds to Interstate, was false at the time it was made.  Similarly the Receiver's May 5, 2011 implied statement that nothing else would prevent the insurance funds from being placed at Crowe's disposal for payment to Interstate, was demonstrably false.  For the same reasons set forth *supra* Section III(C)(1)-(2), the Receiver had no reasonable ground to believe in the truth of these

statements.  5 Witkin, Summary of Cal. Law (10th Ed. 2005) Torts, § 818, p. 1181.

Nor could the Receiver reasonably believe his May 27 statement that all the insurance funds had been transferred to NuView.  As explained *supra* Section III(C)(3)(a), since the Receiver knew that the funds had been credited in the Loan Sale, the Receiver had no reasonable ground to believe the truth of his statement.  (SGD 123.)  With respect to reliance, for the same reasons discussed *supra* Section III(C)(3)(b), the Receiver's May 27 statement was a substantial factor leading Interstate to proceed with the restoration contract and work.[22]  Accordingly, the Receiver is not entitled to summary judgment on this claim.

## E. Triable Issues of Fact Support Interstate's Claims for Restitution and Constructive Trust

The Court allowed Interstate's unjust enrichment claim to proceed on the theory that "Interstate's limited work, up until the Trace assets were sold, *conferred some benefit* on the Receiver . . . ."  (Dkt. 35 at 14.)  The Receiver admits that Interstate's restoration work was a "necessary precursor" to the success of NuView Molecular, in which the Receiver retained a five percent equity interest following the Loan Sale.  (SGD 90, 141.)  Crowe, the head of NuView Molecular, testified that with the help of Interstate's improvements, the valuation of the Trace facility increased by approximately $1.5 - 2 million between 2008 and 2012.  (SGD 156.)  These facts show that Interstate's work conferred an economic benefit on the Receiver through his continued equity stake in NuView Molecular.  Accordingly, there remains a triable issue of restitution and constructive trust.

/ / /

/ / /

/ / /

---

[22]   The Receiver does not attack reliance with respect to the May 4 and May 5 intentional misrepresentation claims, and therefore has not met its initial burden under FRCP 56 on this issue.  (Mot. at 9-10.)

**F.**    <u>**Triable Issues of Fact Support Interstate's Damages**[23]</u>

The Receiver's attempt to limit damages is based on a fundamental misstatement of the record.  Interstate's Rule 30(b)(6) witness testified that in mid-June 2011, Crowe stated that he had not yet *received* the insurance funds; he did *not* state that the Receiver did not transfer them.  (SGD 62.)  Interstate understood this to mean that the fund transfer was in progress, and did not learn the Receiver had never transferred the funds until months later, in November 2011.  (SGD 129, 157.)  The Receiver's efforts to twist this testimony must be rejected.

As discussed *supra* Section III(B)(3), Interstate reasonably relied upon the Receiver as an officer of the Court and had no reason to doubt his word that the funds had been transferred.  (SGD 136, 157.)   Nor was it "patently obvious" to Interstate that the Receiver had not transferred the funds.  Since Interstate had previously encountered delays with the Receiver's processing of papers and payments, it was not alarmed by the delay in Crowe's receipt of the insurance funds.  (SGD 158.)  For instance, although the Receiver received the contract for phase two of demolition in February 25, 2011, the Receiver failed to return a fully executed contract to Interstate until May 13, 2011, over two months later.  (SGD 32, 159.)[24]  Similarly, although Interstate sent an invoice for the demolition work on March 23, 2011, and Crowe sent the check with the funds for the demolition work to the Receiver on April 8, 2011, the Receiver did not deposit the check until April 21, 2011, and did not pay Interstate until May 13, 2011.  (SGD 160.)  Given this history, the Receiver's delay in processing the transfer was hardly cause for suspicion.

---

[23]   The Receiver only raises this argument as a defense to his May 27 misrepresentation.  (Mot. at 23:11-13.)  Nonetheless, the arguments herein equally support the reasonableness of Interstate's reliance on each of the Receiver's misrepresentations.

[24]   While the Receiver will attempt to blame the delay on Trace, it bears emphasis that Trace needed the Receiver's approval before it could sign contracts.  (SGD 96.)  Therefore, it was reasonable for Interstate to attribute the delay to the Receiver.

Last, a jury should weigh the fact that Interstate expected to receive – and did receive – other installments of insurance proceeds totaling $1,285,650.96, which were subsequently disbursed by the insurance carrier directly to Trace and Interstate. (SGD 161.)  Given this cash flow, it was not "manifestly unreasonable" for Interstate to continue working in light of what appeared to be a routine delay in the Receiver's transfer of the other insurance funds.

The Receiver's view that Interstate's decisions after June 10, 2011 were "necessarily based" on its communication with NuView is contrary to law.  "A defrauded person . . . is not barred from maintaining an action merely because he commenced an investigation if it was incomplete or abandoned before discovery of the falsity, particularly if the defendant has a superior knowledge of the facts . . . ."  *Hobart v. Hobart Estate Co.*, 26 Cal. 2d 412, 435 (1945) (en banc).  Courts recognize that the investigation "may have been imperfect because of the representation."  *Shearer v. Cooper*, 21 Cal. 2d 695, 704 (1943) (en banc); *Hobart,* 26 Cal. 2d at 435 (sustaining reliance where "there was evidence that plaintiff did not make a complete investigation because of his reliance upon [defendant's] representations").  For the same reasons discussed above, a jury could find that even if Interstate's investigation was not ideal, it was imperfect by virtue of Interstate's reasonable reliance on the Receiver's misrepresentations.  Thus the Receiver is not entitled to partial summary judgment with respect to damages.

### G.   Punitive Damages Should Be Reserved For the Jury

Punitive damages are available in fraud actions involving intentional misrepresentation or concealment.  Cal. Civ. Code § 3294(c)(3).  "[A]lthough the 'clear and convincing' evidentiary standard is a stringent one, it does not impose on a plaintiff the obligation to 'prove' a case for punitive damages at summary judgment."  *American Airlines, Inc. v. Sheppard, Mullin*, 96 Cal. App. 4th 1017, 1049 (2002).  "[S]ummary judgment on the issue of punitive damages is proper only when no reasonable jury could find the plaintiff's evidence to be clear and

convincing proof of malice, fraud or oppression." *Spinks v. Equity Residential Briarwood Apartments*, 171 Cal. App. 4th 1004, 1053 (2009). Here, even taking into account this standard of proof, the evidence described above would enable a jury to find that the Receiver's conduct clearly constituted Intentional Misrepresentation and Concealment, giving rise to "fraud" under section 3294(c)(3). *See Stevens v. Superior Court*, 180 Cal. App. 3d 605, 610 (1986) (pleading of fraud by concealment sufficient to support claim for punitive damages).

Punitive damages are also available under section 3294(c)(2) in light of the Receiver's brazen attitude. When asked whether he was concerned about taking the insurance funds for the Loan sale, the Receiver replied, "I didn't really care where it came from. I knew I would be entitled to [sic] on a net basis X amount of the proceeds. And I got that . . . so I was happy." (SGD 162). A jury could fairly conclude that it was "contemptible" for an officer of the Court to mislead Interstate with such "conscious disregard." *In re First Alliance Mortgage Co.*, No. CV 01-971 DOC, 2003 WL 21530096, at *6 (C.D. Cal. June 16, 2003).

## IV.   CONCLUSION

For all of the foregoing reasons, Interstate respectfully urges the Court to deny the Receiver's Motion in its entirety.


DATED:  June 2, 2014                    Mitchell A. Kamin
                                        David H. Chao
                                        Bird, Marella, Boxer, Wolpert, Nessim,
                                        Drooks, Lincenberg & Rhow, P.C.



                                        By:     */s/ Mitchell A. Kamin*
                                        _____
                                             Mitchell A. Kamin
                                             Attorneys for Plaintiff Interstate
                                             Restoration, LLC

1

## PROOF OF SERVICE

2

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

3

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action; my business address is 1875

4

Century Park East, 23rd Floor, Los Angeles, California 90067-2561.

5

On June 2, 2014, I served the following document(s) described as

6

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT**

7

on the interested parties in this action as follows:

8

### SEE SERVICE LIST BELOW

9

**BY CM/ECF NOTICE OF ELECTRONIC FILING:**  I electronically filed the

10

document(s) with the Clerk of the Court by using the CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

11

Participants in the case who are not registered CM/ECF users will be served by mail or by other means permitted by the court rules.

12

I declare under penalty of perjury under the laws of the United States of

13

America that the foregoing is true and correct and of my own personal knowledge.

Executed on June 2, 2014, at Los Angeles, California.

14

15

16

*/s/ Max Mitchell*
Max Mitchell

17

### SERVICE LIST

18

**Interstate Restoration LLC v. Thomas Seaman, Receiver**
**Case No. SACV13-706-DOC (RNBx)**

19

Ted G. Fates

20

Senior Counsel
Allen Matkins

21

501 West Broadway, 15th Floor
San Diego, CA  92101-3541

22

Telephone: (619) 235-1527
Facsimile: (619) 233-1158

23

Email:  tfates@allenmatkins.com
**Counsel for Defendant**

24

David R. Zaro
Michael R. Farrell
Allen Matkins
515 South Figueroa Street, Ninth Floor
Los Angeles, CA  90071-3309
Telephone: (213) 633-5555
Facsimile: (213) 620-8816
Email:: dzaro@allenmatkins.com
       mfarrell@allenmatkins.com
**Counsel for Defendant**

25

26

27

28

PLAINTIFF INTERSTATE RESTORATION, LLC'S OPPOSITION
TO THE RECEIVER'S MOTION FOR SUMMARY JUDGMENT